**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Petitioners,**

**v.**

**Donald P. HODEL, Secretary of the Interior, Respondent,**

**the American Petroleum Institute, et al., Intervenors.**

**No. 87–1432, et al.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1988.

Decided Dec. 30, 1988.

James Thornton, Natural Resources Defense Council, Inc., et al., New York City, and John A. Saurenman, Deputy Atty. Gen., State of Cal., Los Angeles, Cal., with whom Mary Gray Holt, Deputy Gen. Counsel, State of Cal., Long Beach, Cal., Joseph Spicola, Gen. Counsel, Tampa, Fla., and Louis F. Hubener, Asst. Atty. Gen., State of Fla., Tallahasse, Fla., James M. Shannon, Atty. Gen., and Lee P. Breckenridge, Asst. Atty. Gen., State of Mass., Boston, Mass., Michael D. Reynolds and Philip Schradle, Asst. Attys. Gen., State of Or., Salem, Ore., Jerry A. Ackerman, Asst. Atty. Gen., State of Wash., Roger Beers, County of Mendocino, et al., San Francisco, Cal., and Sarah Chasis, Natural Resources Defense Council, Inc., et al., New York City, were on the brief, for petitioners.

Rebecca A. Donnellan and Wells D. Burgess, Attys., Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., Dirk

D. Snel, Atty., Dept. of Justice, and Susan Hoven, Atty., Dept. of Interior, Washington, D.C., were on the brief, for respondent.

E. Edward Bruce, with whom Richard H. Seamon, G. William Frick, and James K. Jackson, Washington, D.C., were on the brief, for Intervenors, The American Petroleum Institute, et al. Bobby R. Burchfield, Washington, D.C., Philip K. Verleger and Donna R. Black, Los Angeles, Cal., also entered appearances for American Petroleum Institute, et al.

Robert S. Venning, with whom Gregory S. Gilchrist, San Francisco, Cal., was on the brief, for amici curiae, Rep. Leon Panetta, et al.

Before RUTH BADER GINSBURG, STARR, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judges RUTH BADER GINSBURG, STARR, and SENTELLE.

Opinion dissenting in part filed by Circuit Judge STARR.

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. BACKGROUND | 291 |
| II. MOTION TO SUPPLEMENT THE RECORD | 293 |
| III. NEPA ISSUES | 294 |
| A. Standard of Review | 294 |
| B. Conservation as Partial Alternative | 295 |
| C. Cumulative Impact on Migratory Species | 297 |
| IV. OCSLA ISSUES | 300 |
| A. Standard of Review | 300 |
| B. Area Issues | 300 |
| 1. Administrative planning areas | 300 |
| 2. Area exclusion | 302 |
| a. Ripeness and standing | 303 |
| b. Criteria for decision | 304 |
| c. Adequacy of explanation | 305 |
| d. Political considerations | 305 |
| C. Section 18(a)(3): Cost Benefit Analysis | 306 |
| 1. Calculation of Net Economic Value | 306 |
| 2. Calculation of Social Costs | 309 |
| D. Section 18(a)(4): Minimum Bid Analysis | 312 |
| 1. Minimum Bid Price | 313 |
| 2. Secretarial Discretion | 314 |
| 3. Presidential Letter | 314 |
| V. PUBLIC LAW 99-591 | 316 |
| VI. CONCLUSION | 319 |

RUTH BADER GINSBURG, STARR, and SENTELLE, Circuit Judges:

This case requires the court, for the third time, to review a five-year schedule of offshore oil and gas leasing activity proposed by the Secretary of the Interior. For the reasons stated in this opinion, we hold that the Secretary failed to perform an adequate analysis of the cumulative impacts of the program on migratory species. We remand that matter to the Secretary but uphold the program in all other respects.

## I. BACKGROUND

The Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356 (1982), enacted in 1953, authorizes the Secretary of the Interior to sell leases to develop oil and gas deposits in the OCS. Congress amended the statute in 1978 to promote the rational development of OCS resources. As delineated in the amended Act, the purposes of OCSLA include the "expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals,

assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade," but these objectives are to be balanced with "protection of the human, marine, and coastal environments." *Id.* § 1802(1)–(2).

OCSLA, as amended, describes and governs a five-step process: (1) the promulgation of a five-year leasing program, *id.* § 1344; (2) lease sales, *id.* § 1337; (3) exploration, *id.* § 1340; (4) development and production, *id.* § 1351; and (5) sale of recovered minerals. *Id.* § 1353. At various points throughout the development of the leasing program, OCSLA provides for participation by Congress, affected state and local governments, relevant federal agencies, and the public. *Id.* 1344(c)–(d), (f).

Section 18 of OCSLA, *id.* § 1344, requires the Secretary to prepare, maintain, and periodically revise a leasing program consisting of a schedule of proposed lease sales. Under section 18(a), the Secretary is to indicate "as precisely as possible, the size, timing and location of leasing activity."

Section 18(a), in addition, prescribes four guiding principles for the program. (1) Impact on other resources and on "economic, social, and environmental values" must be considered. (2) "Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions" of the OCS shall be based on eight factors: (A) "existing information concerning the geographical, geological, and ecological characteristics of such regions"; (B) "an equitable sharing of developmental benefits and environmental risks among the various regions"; (C) "the location of such regions" with respect to energy markets; (D) "the location of such regions" with respect to other uses of the sea; (E) the interest of producers in development; (F) such laws and policies of affected states as the governors of those states specifically identify as relevant; (G) "the relative environmental sensitivity and marine productivity" of different areas; and (H) "relevant environmental and predictive information for different areas" of the OCS. (3) Timing and location of leasing shall obtain, "to the maximum extent practicable, ... a proper balance" between the risk of environmental damage and the potential for oil and gas discovery. (4) Leasing "shall be conducted to assure receipt of fair market value for the lands leased." *Id.* § 1344(a).

Subsections 18(c) and (d) require the Secretary to invite and consider comments from governors of affected states and to state his reasons for accepting or rejecting their recommendations. *Id.* § 1344(c)–(d). Subsection 18(e) requires the Secretary to review the leasing program at least annually; any significant revision he proposes is to proceed for adoption "in the same manner" as the original development of the plan. *Id.* § 1344(e).

In 1980 the Secretary adopted a five-year leasing program for 1980–1985. This program, largely prepared by Secretary Andrus, was challenged in this court by various state and local governments and several environmental groups. Petitioners claimed that the program failed to meet the requirements of OCSLA and other statutes. In *California v. Watt*, 668 F.2d 1290 (D.C.Cir.1981) (*Watt I*), this court noted several deficiencies in the program and remanded to Secretary Watt for revision consistent with its opinion.

Secretary Watt revised the program in the course of his annual review pursuant to section 18(e). In January 1982 the court approved the Secretary's proposed timetable for completing the revision, and in July 1982 the Secretary approved a five-year program for 1982–1987. Again various states and environmental groups challenged the plan for alleged violations of OCSLA and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347 (1982). These claims were all rejected in *California v. Watt*, 712 F.2d 584 (D.C.Cir. 1983) (*Watt II*).

Beginning in fiscal year 1982, in response to Secretary Watt's plan, Congress imposed a series of moratoria against leasing parts of the California OCS and other

regions.[1] This protracted dispute with the Secretary eventually prompted Public Law 99–591, section 111, *reprinted in* 1986 U.S. Code Cong. & Admin.News at 100 Stat. 3341, 3341–261 to –262, which requires the Secretary to explain "in detail" why he rejected proposals regarding California submitted by designated members of Congress and by the governor of California.

Meanwhile, the Secretary began the development of the five-year plan for 1987–1992. 49 Fed.Reg. 28,332 (1984). The draft Proposed Program was released in March 1985; the Proposed Program, in February 1986; a Draft Proposed Final Program for Offshore California, in February 1987; the Proposed Final Program (PFP) along with a Secretarial Issue Document (SID), in April 1987; and on July 2, 1987, Secretary Hodel approved the program at issue in this case. Comments were received throughout this administrative process.

Petitioners National Resources Defense Council (NRDC), the states of California, Florida,[2] Massachusetts, Oregon, and Washington, and various environmental groups, challenged Secretary Hodel's program on a variety of grounds, including alleged violations of NEPA, OCSLA section 18, and section 111 of Public Law 99–591. These cases were consolidated January 29, 1988. Intervenors in support of the Secretary include the American Petroleum Institute (API). Petitioners request that the court remand the program to the Secretary and vacate sales in particularly sensitive areas.[3] Concluding that the Secretary failed to consider sufficiently, in preparing the environmental impact statement required by NEPA, the cumulative impacts of the leasing program on migratory species, we remand that matter for the Secretary's further attention; in all other respects, we deny the petitions for review.

## II. MOTION TO SUPPLEMENT THE RECORD

As a preliminary matter, we address petitioners' motion to supplement the record. Petitioners seek to add information showing, they allege, that the Secretary failed to utilize in the five-year program the most accurate information available to him regarding Northern California. Petitioners assert that the Draft Environmental Impact Statement (DEIS) covering just one sale, Lease Sale 91 in Northern California, contains estimates of the number of platforms and amount of oil to be produced that greatly exceed the estimates used in the five-year program for the entire Northern California region. The Secretary possessed those higher estimates, petitioners say, at the time he developed the five-year program. Because he did not use the "best information available," petitioners charge, the Secretary failed to perform properly the analyses required by OCSLA and section 111 of Public Law 99–591. Petitioners rely on documents obtained from the Department of Interior through a Free-

1. *See* H.R.Rep. No. 163, 97th Cong., 1st Sess. 10 (1981) (moratorium in Northern California for 1982); H.R.Rep. No. 942, 97th Cong., 2d Sess. 15 (1982) (continuing moratorium for 1983); H.R. Rep. No. 253, 98th Cong., 1st Sess. 35 (1983) (moratorium extended to parts of Southern and Central California, North Atlantic, and Eastern Gulf of Mexico for 1984); H.R.Rep. No. 886, 98th Cong., 2d Sess. 33 (1984) (moratorium in North Atlantic and California areas continued for 1985).

2. In April (after petitioners' first set of briefs were filed), the Secretary reached a settlement with Florida, and on April 29, that state's petition was dismissed.

3. Petitioners specify the North Atlantic, Northern and Central California, North Aleutian Basin, Washington–Oregon, Straits of Florida (Area L), and Areas I, K, and F in the Eastern Gulf of Mexico as areas of particular concern. Since the filing of petitioners' and respondent's initial briefs, the Secretary has taken actions affecting three lease sales petitioners wish to have vacated. On June 6, the Secretary delayed publication of a final environmental impact statement for Lease Sale 91 on the Northern California OCS (originally scheduled for February 1989) to permit the new incoming administration *to decide whether to proceed with the* sale. On June 16, the Secretary announced that Lease Sale 116 on the Eastern Gulf of Mexico OCS (originally scheduled for November 1988) would be segmented and partially deferred to allow more analysis before sale. On June 16, the Secretary delayed Lease Sale 96 on the North Atlantic OCS (originally scheduled for February 1989) for at least six months to allow time for a negotiated solution.

dom of Information Act request, and they now ask the court to make these documents part of the administrative record (petitioners at oral argument withdrew their request for additional discovery).

Even if the Secretary did possess more accurate, higher estimates for Lease Sale 91 when drawing up the five-year program, he acted reasonably, we believe, when he adopted a cutoff time for consideration of new data in order to ensure consistency among planning areas. Different databases and economic analyses are used in making estimates for the five-year program, on the one hand, and for specific lease sales, on the other. Introducing sale-specific information for Sale 91 into the five-year program before similar information is available for other areas, therefore, might skew the comparative analysis required by OCSLA.

A situation could arise, we acknowledge, in which sale-specific information available prior to final approval of the five-year program reveals an error or omission so large or so glaring that refusal to use it to adjust the program would be arbitrary. *Cf. Friends of the River v. FERC,* 720 F.2d 93, 108–09 n. 35 (D.C.Cir.1983). In this case, however, the Secretary acted within the bounds of his discretion in concluding that the Sale 91 data did not warrant deviating from the cutoff time. On the surface, the estimates for Sale 91 appear to be drastically higher than the estimates for Northern California in the five-year program. This discrepancy is largely explained, however, by the five-year program's use of "risked" estimates, which take into account the probability that oil and gas will not be found in a region, and Sale 91's use of "conditional" estimates, which do not take that probability into account. When the "risked" estimates for Sale 91 and the five-year program are compared, the difference is not large; the Secretary's refusal to reconsider the analysis of Northern California in the five-year program, therefore, was not unreasonable. Accordingly, we deny petitioners' motion to supplement the record.

## III. NEPA ISSUES

### A. *Standard of Review*

NEPA requires every federal agency to include an environmental impact statement (EIS) "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As part of that statement, the agency (or the responsible official) must include a discussion of alternatives to the proposed action. *Id.* § 4332(2)(C)(iii). Section 4332(2)(E) also requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," and regulations promulgated by the Council on Environmental Quality (CEQ) provide that the EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (1987).

■ NEPA's requirements are "essentially procedural"; as long as the agency's decision is "fully informed" and "well-considered," it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment. *North Slope Borough v. Andrus,* 642 F.2d 589, 599 (D.C.Cir.1980). Nevertheless, the court should "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh,* 655 F.2d 346, 371 (D.C.Cir. 1981) (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)).

■ NEPA's requirement of a discussion of alternatives, therefore, should be superintended according to a "rule of reason." *See, e.g., North Slope Borough v. Andrus,* 642 F.2d at 600; *Alaska v. Andrus,* 580 F.2d 465, 475 (D.C.Cir.) ("[R]ule of reason necessarily governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them."), *va-*

*cated in part as moot,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); *NRDC v. Morton,* 458 F.2d 827, 837 (1972) (NEPA should be "construed in the light of reason if it is not to demand what is ... not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite"). As the Supreme Court admonished in *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), "the concept of alternatives [under NEPA] must be bounded by some notion of feasibility." *Id.* at 551, 98 S.Ct. at 1215. Thus, agencies are not required to consider alternatives that are "remote and speculative," *NRDC v. Morton,* 458 F.2d at 838, but may deal with circumstances "as they exist and are likely to exist." *Carolina Envtl. Study Group v. United States,* 510 F.2d 796, 801 (D.C.Cir.1975).

## B. *Conservation as Partial Alternative*

Petitioners maintain that the Secretary should have considered various conservation policies as a partial alternative to the five-year program, eliminating the need for leasing in environmentally sensitive areas. They offer two examples of conservation strategies that could replace (or at least defer) leasing in sensitive areas: requiring more stringent appliance efficiency standards and stricter automobile fuel economy standards. They assert, illustratively, that increasing the Corporate Average Fuel Efficiency (CAFE) standards for the 1995 model year fleet to 45 miles per gallon (mpg) for cars and 35 mpg for light trucks, as current technology would allow, would save 2.2 million barrels of oil per day, or 15.8 billion barrels over 20 years, whereas drilling in six particular planning areas (North, Central, and Southern California, the North Atlantic, Washington–Oregon, and the North Aleutian Basin) would yield a projected total of only 1.2 billion barrels. Replacing drilling in those areas with higher fuel efficiency standards, they conclude, would yield a net energy gain of 14.6 billion barrels, while providing significant environmental benefits.

Petitioners' arguments rest on the premise that conservation strategies can, at least in part, achieve the goals of the five-year program as well as OCS leasing can. They contend that the program's purpose of meeting the nation's basic energy needs and improving the nation's energy security can be accomplished not only by increasing domestic oil production, but also (partly) by reducing the demand for oil through energy conservation. Petitioners thus assume that the program is aimed at producing a fixed sum of oil and gas, and that a conservation program can substitute for a given quantum of that oil and obviate the need for a particular lease sale.

Rather than consider the alternative of conservation plus reduced drilling, petitioners argue, the Secretary considered conservation only as a *complete* substitute for OCS leasing under the "no action" alternative. (40 C.F.R. § 1502.14(d) specifically requires agencies to consider what would happen if no action were taken.) Moreover, they claim, the Secretary considered only conservation that resulted in the free market from higher energy prices, and did not look at possible government regulatory measures that could mandate or encourage conservation.

The Secretary's response is two-fold. First, he contends that he did not have to consider conservation as a *partial* alternative to OCS leasing because even "the most optimistic forecasts show that energy conservation *and* full-scale OCS production combined cannot meet the nation's energy needs." Brief for Respondent at 24 (emphasis added). Second, he argues that the Final Environmental Impact Statement (FEIS) and the National Energy Policy Plan (NEPP), incorporated by reference into the FEIS, comprehensively considered conservation (albeit the topic's placement was under the "no action" alternative), and that the specific measures discussed by petitioners are encompassed in the FEIS's broader analysis.

We reject the Secretary's contention that he need not consider partial conservation alternatives *at all* because the nation's energy demands are likely to increase even

with gains in energy conservation and development of alternative energy sources.[4] This argument proves too much, because it would relieve the Secretary of his duty under NEPA to consider alternatives altogether. Yet OCSLA explicitly provides that nothing in the Act diminishes the requirements of NEPA. 43 U.S.C. § 1866(a). Moreover, the Secretary's argument overlooks the reasons for NEPA's requirement that agencies consider alternatives. The purpose is not merely to force the *agency* to reconsider its proposed action, but, more broadly, to inform Congress, other agencies, and the general public about the environmental consequences of a certain action in order to spur all interested parties to rethink the wisdom of the action. As a panel of this court affirmed in *NRDC v. Morton:*

> Congress contemplated that the Impact Statement would constitute the environmental source material for the information of Congress as well as the executive, in connection with the making of relevant decisions, and would be available to enhance enlightenment of—and by—the public.

458 F.2d at 833;[5] *see also Committee for Nuclear Responsibility v. Seaborg,* 463 F.2d 783, 787 (D.C.Cir.) (same), *application for injunction in aid of jurisdiction denied,* 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971).

 Given this informational purpose of NEPA, then, the Secretary must consider alternatives even if they do not reduce the need for OCS leasing. The continuing need for development of the OCS, however, reduces the *scope* of the required consideration. This follows from the "rule of rea-

son" applicable to NEPA's strictures. *See supra* pp. 294–295. In these circumstances, NEPA's informational function is served by a less searching treatment of alternatives than is otherwise required. Without attempting precise delineation of the line between adequate and inadequate consideration of alternatives, we hold that the Secretary's accounting for conservation alternatives here was adequate.

The FEIS contains a general discussion of energy conservation policies in an Appendix entitled "Alternative Energy Sources." *See* U.S. Dep't of Interior, *5–Year Outer Continental Shelf Oil and Gas Leasing Program Mid–1987 to Mid–1992, Final Environmental Impact Statement* (FEIS), App. C at 39–44. That discussion lists five major conservation options proposed as substitutes for energy development projects (improved gas mileage, greater use of mass transit, improved household appliance efficiency, improved efficiency in the industrial and commercial sectors, and augmented public and private research of conservation), and mentions the different ways in which conservation can be achieved under those options. One of the means thus identified is regulation. *See id.* at 42–43.

In addition, the FEIS refers to the NEPP, which projects the nation's energy demands up to the year 2010. *See id.* at 39–42. Although the NEPP does not specifically address augmented governmental regulation, it utilizes a model that contains varying energy consumption projections based on different "consumer discount rates." The "high energy efficiency" prediction, according to the NEPP, serves as a

---

**4.** This court stated clearly in *NRDC v. Morton,* 458 F.2d 827 (D.C.Cir.1972), that the Secretary must consider partial as well as complete alternatives:

> Nor is it appropriate ... to disregard alternatives merely because they do not offer a complete solution to the problem. If an alternative would result in supplying only part of the energy that the lease sale would yield, then its use might possibly reduce the scope of the lease sale program and thus alleviate a significant portion of the environmental harm attendant on offshore drilling.

*Id.* at 836.

**5.** Similarly, a panel of this circuit held that an agency was not absolved of its duty to consider alternatives to a proposed action even though *Congress* had specifically authorized the action after examining the action's environmental impacts. *See Izaak Walton League of America v. Marsh,* 655 F.2d 346, 365–68 (D.C.Cir.1981). The court held that the FEIS was more than just a "legislative aid"—or, for that matter, an agency aid—but was meant "in part to ensure that the public has an opportunity to participate meaningfully in decision-making at the administrative and legislative levels." *Id.* at 365.

"proxy" for non-energy price factors affecting efficiency, including government-ordered conservation programs. U.S. Dep't of Energy, *National Energy Policy Plan Projections to 2010* at 4–29 (1985), Joint Appendix (J.A.) at 1656. The NEPP predictions appear to incorporate gains from the types of regulatory measures petitioners proposed and thus to indicate that full-scale OCS leasing would be in order even if reasonable conservation measures were adopted.

Finally, the proposals suggested by petitioners before this court and in comments submitted to the Department of the Interior are included in the FEIS. *See* FEIS, App. L, Comments of NRDC *et al.* The inclusion of these comments merits credit as a counter to flaws in the Secretary's analysis. *Cf. Sierra Club v. Adams*, 578 F.2d 389, 394, 396 (D.C.Cir.1978) (holding that EIS's discussion of alternatives was adequate in part because of inclusion of interested parties' comments and government's responses).

We are satisfied, in sum, that, overall, the Secretary's coverage of conservation in this case serves NEPA's informational function, although the FEIS and NEPP themselves deal with the matter in general terms and do not provide petitioners with detailed responses to their comments. *Cf. id.* at 396. The Secretary has not disregarded conservation alternatives, and we have no warrant to insist on more particulars from him, in view of his showing that, despite reasonable government regulation to achieve conservation, the nation's energy needs call for the contribution OCS development can make.

### C. *Cumulative Impact on Migratory Species*

■ Petitioners' second NEPA claim concerns the failure of the FEIS to consider the cumulative impacts of simultaneous development in the Pacific and Alaskan regions on species, particularly whales and salmon, that migrate through the different planning areas. Petitioners contend that the cumulative impact of simultaneous development will be greater than the sum of development in each area considered separately because migratory species will have to swim through each area, with no respite from the harmful effects of OCS development. Because of the "synergistic" effect of this development, petitioners argue, the FEIS should have considered the cumulative impact of simultaneous development on migratory species, and not just the separate effects in each planning area. Had the Secretary done so, they reason, he might have cancelled or deferred some of the lease sales in the two regions so that migratory species would not be exposed to maximum risks throughout their habitat simultaneously.

The Secretary responds simply that the FEIS *does* touch on cumulative impacts. He does not contest petitioners' claim that maximum development in the region will be allowed to occur simultaneously and that cumulative impacts on migratory species may be severe.

Our examination of the FEIS satisfies us that the Secretary did *not* consider the effect of simultaneous *inter*-regional development on migratory species. We therefore remand for consideration of this issue and for any revisions of the program the Secretary determines to be warranted by the new analysis.

NEPA, as interpreted by the courts, and CEQ regulations both require agencies to consider the cumulative impacts of proposed actions. The Supreme Court has held that, under NEPA,

> proposals for ... related actions that will have cumulative or synergistic environmental impact upon a region concurrently pending before an agency must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate the different courses of action.

*Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976).

The purpose of this requirement is to prevent agencies from dividing one project into multiple individual actions "each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Thomas v.*

*Peterson,* 753 F.2d 754, 758 (9th Cir.1985); *see also Save the Yaak Comm. v. Block,* 840 F.2d 714, 720 (9th Cir.1988); *NRDC v. Callaway,* 524 F.2d 79, 87–90 (2d Cir.1975); *Manatee County v. Gorsuch,* 554 F.Supp. 778, 793 (M.D.Fla.1982).

CEQ regulations specifically provide that an EIS should consider together actions that "are interdependent parts of a larger action and depend on the larger action for their justification," "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts," and "similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing and geography." 40 C.F.R. § 1508.25(a) (1987); *see also* Council on Environmental Quality, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* 46 Fed.Reg. 18,033 (1981). Those regulations also specify that an EIS should consider any cumulative impacts of agency action. 40 C.F.R. § 1508.25(c). "Cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... undertakes such other actions." *Id.* § 1508.7.

In this case, the Environmental Protection Agency (EPA) expressed serious concern to the Secretary over the lack of any consideration in the DEIS of inter-regional cumulative impacts. The EPA criticized the DEIS for not analyzing "the cumulative effects on migratory species whose habitat extends into numerous planning basins and regions" and admonished the Secretary to "identify the migratory species of endangered cetaceans, marine mammals, and marine and coastal birds and the full extent of each species' distribution (the full range of their habitat)" and to "include all state and federal oil and gas leasing, oil and gas infrastructure, and non-OCS/non-oil-and-gas activities that fall within their distribution." FEIS, App. E, May 9, 1986 Letter from EPA.

The Secretary asserts that, in response to the EPA's letter, the Department of the Interior added the requisite analysis to the FEIS. Although the FEIS contains sections headed "Cumulative Impacts," in truth, nothing in the FEIS provides the requisite analysis. The FEIS for the most part considers only the impact *within each area* of non-OCS actions plus OCS development and not the impact of simultaneous OCS development in different areas. The few times the FEIS *does* discuss the impact of simultaneous OCS development in different areas, it makes only conclusory remarks, statements that do not equip a decisionmaker to make an informed decision about alternative courses of action or a court to review the Secretary's reasoning.

In the FEIS's analysis of the Oregon/Washington planning area, which the Secretary cites as "instructive," Brief for Respondent at 31, cumulative impacts are first mentioned in the introduction to the FEIS: "The expected cumulative impacts for the migrating species in each planning area include consideration of the expected effects in all planning areas used by each species." FEIS II–31. This promising announcement, however, has scant follow-up. In the specific discussion of cumulative impacts for Oregon/Washington, the Secretary mainly discusses the combined impact of OCS leasing with other activities *in that area.* Characteristically, the FEIS states:

> The additive effects of this proposal, combined with other proposed and existing projects, are estimated to increase the degree of anthropogenically contributed noise and disturbance on marine mammals *within the Planning Area.* Major existing sources of potential impacts to marine mammals *within the area* include commercial shipping activities ... commercial fishing operations ... coastal development projects ... pollution ... and marine tankering.

FEIS IV.B.7.–25 (emphasis added).

This type of statement does not address the issue raised by the EPA, and which NEPA requires the Secretary to consider: the cumulative impacts of *OCS development* in *different* areas. Only a few sen-

tences in the entire discussion even purport to deal with inter-regional cumulative impacts:

> Marine mammals which migrate through this Planning Area will be subjected to other impacts outside of the area. Cumulative impacts to these migrating species will probably intensify due to other oil and gas activities within their range to the north and south, including the OCS activities off California and Alaska. Noise levels are expected to increase throughout much of the range of these species.... Migrating species are subjected to stresses from municipal and industrial discharges and other human activities, including existing oil and gas operations throughout their range.

*Id.* at 25–26.

In its specific discussion of whales, under the subcategory of threatened or endangered species, the FEIS again deals primarily with the cumulative impact of activities *in that one region.* *See* FEIS IV.B.7.–32–33. The FEIS does devote a few more sentences here to the inter-regional effects on migrating species but these snippets do not constitute real analysis; they merely state (and restate) the obvious:

> Those species which pass through other areas with potentially high risk of an oil spill (such as California) are most vulnerable to high impacts from a spill. For example, the coastal migration routes of the California gray whale which could subject a large segment of the population to an oil spill. [sic] The Brown pelican is also exposed to risks from an oil spill throughout much of its range, including its breeding areas in Southern California....
>
> With or without the proposal, threatened and endangered species are expected to suffer low to moderate ecological losses over the next 35 years. Migrating species are subjected to stresses from an-

thropogenic sources throughout their range.

FEIS IV.B.7.–33.

The Secretary asserts that this treatment typifies the approach used in the FEIS for the other planning areas, and that a like analysis was used for salmon. "Typifies" is an understatement. When the FEIS does address *inter*-regional cumulative impacts, it simply repeats the same boilerplate for each area, varying the language only slightly in each instance. *See, e.g.,* FEIS IV.B.8–14, 19 (Northern California); IV.B.9.–19, 26 (Central California); IV.B. 10.–34, 42–43 (Southern California).

Even under the applicable deferential standard of review, we believe that allowing the Secretary's "analysis" to pass muster here would eviscerate NEPA. In each place in which the FEIS even mentions inter-regional impacts of OCS development, it merely announces that migratory species may be exposed to risks of oil spills and other "impacts" throughout their routes. These perfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.[6] We therefore remand this matter to the Secretary for further consideration and any revisions in the five-year program that consideration may warrant.

This court's task is simply to ensure that agencies faithfully follow Congress' direction. It is not our function, or within our competence, to dictate the actual details of implementation to the agencies, and we essay no mechanical or formal instructions for the Secretary to follow. To minimize the risk of unnecessary delay and waste of resources on remand, however, we offer some general guides on what would appear to satisfy NEPA here. The Secretary could, first of all, examine cumulative impacts of simultaneous inter-regional OCS development in a single, coherent section rather than fragment his analysis by area. This comprehensive section could

---

**6.** The Secretary attempts to establish the adequacy of the FEIS's coverage by showing that the consideration of cumulative impacts resulted in a change in expected cumulative impacts from "low" in the DEIS to "moderate" in the

FEIS. Given that the DEIS did not consider cumulative impacts *at all,* and given that the FEIS itself contains no sustained "analysis," the change in conclusion does not suffice.

then, as the EPA suggested in its comments on the DEIS, *see supra* p. 18, identify the various migratory species and the full range of their routes of migration, describe the OCS and non-OCS activities along those routes, and state the synergistic effect of those activities on the migratory species. The Secretary could support such a presentation with references to scientific studies and other materials so that a decisionmaker would have ready access to the information underlying the Secretary's findings and conclusions. Finally, the Secretary could, consistent with NEPA's requirement that he consider alternatives to the proposed action, examine alternatives to simultaneous development that would mitigate any synergistic impacts on migratory species, such as staggering development. The Secretary could set out the pros and cons of various alternatives and explain his reasons for adopting whatever course of action he decides upon. Whatever further examination and explication the Secretary himself determines to undertake, we anticipate that his reconsideration will be accomplished promptly, in advance of any actual development in the Alaska and Pacific regions.[7]

## IV. OCSLA ISSUES

### A. *Standard of Review.*

■ The standards for our review of the Secretary's program are set out in *Watt I,* 668 F.2d at 1300–03, and restated in *Watt II,* 712 F.2d at 590–91. Briefly summarized, those deferential standards require that the record show that the Secretary's factual determinations are based upon substantial evidence, that the Secretary's policy judgments are based upon rational consideration of identified, relevant factors, and that the Secretary's construction of the statute is permissible. In this last respect, we are directed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), decided since our

last consideration of an OCSLA leasing program, to affirm an implementing agency's construction of a statute when Congress has not expressed its clear intent on the precise question at issue and the agency advances a permissible construction. When the Secretary's program meets these standards, we defer to his findings, interpretations, and judgments; when it does not, we remand for his appropriate consideration or action.

### B. *Area Issues.*

#### 1. Administrative Planning Areas.

■ OCSLA directs the Secretary to schedule leasing "among the oil- and gas-bearing physiographic regions of the outer Continental Shelf" based upon consideration of factors set out in the statute. 43 U.S.C. § 1344(a)(2). According to petitioners, the phrase "oil- and gas-bearing physiographic regions" in the premise of section 18(a)(2) and the echoing use of the phrase "such regions" in several subparagraphs thereunder require the Secretary to make the section 18 comparative analyses only between those discrete areas whose geologic characteristics show oil or gas potential. The Secretary's administrative planning areas, they complain, simply divide the entire OCS into a number of large, contiguous rectangular areas that have no apparent relation to the location of oil- and gas-bearing formations. (The North Atlantic Planning Area, for example, covers roughly the area offshore Maine, New Hampshire, and Massachusetts.) Petitioners contend that *Watt I* requires the Secretary to use the "best information available," 668 F.2d at 1307, and that the Secretary already has information, as well as data collection powers under subsections 18(g) and (h), to better identify oil- and gas-bearing physiographic regions. Accordingly, argue petitioners, the Secretary did not do, or at least did not articulate, a section 18 analysis based on regions of the proper scope.

---

**7.** We note that the President has recently signed into law legislation that directs the Secretary not to expend any of the Department of Interior's appropriation on the conduct of leasing or the approval of any drilling or exploration in several areas, including Lease Sale 91 in the Northern California planning area. *See* Pub.L. No. 100–446 § 111 (1988).

This alleged failure is material, petitioners contend, because the Secretary's approach improperly aggregates data regarding regions with differing petroleum potential. To illustrate, petitioners contend that the Secretary might have excluded (or at least delayed) leasing in the fisheries of the Georges Bank Basin if that area had been analyzed separately instead of being lumped in the North Atlantic planning area with other areas richer in hydrocarbon potential. Petitioners contend that the Secretary's expressed intent to refine the area to be leased in subsequent, sale-specific stages of the program is inadequate to correct the distortion they perceive, because sale-specific decisions do not revisit the section 18 comparative analysis. *Watt I*, 668 F.2d at 1306. The remedy, petitioners contend, is remand for a section 18 analysis comparing regions of proper scope.

There is no occasion to grant this remedy, because the Secretary has made an eminently reasonable interpretation of an ambiguous statute, and we give his interpretation the deference it is due. We have inquired whether OCSLA "directly addressed," *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, the permissible geographic or geologic scope of the areas the Secretary is to compare in his section 18 analysis and concluded that OCSLA "is silent or ambiguous with respect to the specific issue," *id.*, of scope. The phrase "oil- and gas-bearing physiographic regions" is not defined in the statute. The legislative history does not use the phrase, referring instead to "various geographic regions," H.R.Rep. No. 590, 95th Cong., 2d Sess. 149 (1977), 1978 U.S. Code Cong. & Admin.News pp. 1450, 1555, 1702, and "various [OCS] areas." H.R. Conf.Rep. No. 1474, 95th Cong., 2d Sess. 103 (1978). Further, it appears from the briefs of the parties that the phrase "physiographic regions" is not used by geologists; the term in use that is apparently most analogous, "physiographic province," is defined, however, as a discrete "region" homogeneously similar in geologic structure and other characteristics. *See* Brief

for Petitioners [8] at 42 n. 33 (citing *Glossary of Geology* 474 (2d ed. 1980)); Brief for Respondent at 66–67 & n. 30 (same). Petitioners advise us that the undefined statutory phrase must therefore refer to "a region of rocks, similar in structure and origin, that has petroleum potential." Brief for Petitioners at 42 (footnote omitted). The government does not materially dispute this definition, but cites technical references to the general effect that the term by no means implies a small-scale homogeneity, a point on which petitioners apparently demur. *See* Revised Final Response Brief of Petitioners and Intervenors at 19–20 ("Reply Brief for Petitioners").

At this point, it is not at all apparent to us that Congress intended the Secretary to build the program upon the foundation of a meticulous and restrictive reading of this phrase. The legislative history evidences no concern with the term and in fact does not use it, even though Congress appears to have coined the phrase. We are led by the Secretary to understand that the term "physiographic province" tendered as synonymous by petitioners may, in the submarine context, refer to an area no more precise than the " 'North American Atlantic Slope.' " Brief for Respondent at 67 n. 31 (quoting *Encyclopedia of the Geological Sciences* 630 (1978)). The Secretary's planning areas plainly encompass the oil- and gas-bearing regions. We fail to see, then, an unmistakable meaning of the phrase "oil- and gas-bearing physiographic regions" that the Secretary's practice violates.

Further doubt about the necessity of petitioners' tendered construction arises when we examine the basis upon which section 18(a)(2) expressly directs the Secretary to compare the "regions." Several of the statutory considerations have little or no apparent relation to undersea geologic formations: for example, the equitable sharing of benefits of development and the proximity and relative needs of energy markets have far more to do with on-shore considerations. *See* 43 U.S.C.

---

**8.** We refer hereby to the brief filed jointly by all petitioners, having no occasion to cite in this opinion the briefs filed by individual petitioners.

§ 1344(a)(2)(B), (C); *see also Watt II*, 712 F.2d at 595 (noting "common-sense proposition that ... land lying under the ocean[ ] does not benefit from development"). The fact that the statute directs such comparisons indicates a congressional intent that the comparison be made on a basis that facilitates such comparisons and to which such comparisons are relevant. In addition, parts of section 18(a)(2) direct the Secretary to compare "different areas," *id.* §§ 1344(a)(2)(G)–(H)—another undefined term. We conclude that Congress did not unambiguously direct the Secretary to found his section 18(a) analysis, and the resulting leasing program, solely on the basis of the location and extent of discrete undersea geologic formations.

It is some indication that the phrase on which petitioners now rely does not speak clearly and directly to the scope of the areas to be compared that the phrase was not made an issue in our review of the two previous leasing programs. This is the third such leasing program to use broadly drawn administrative planning areas. The *Watt I* petitioners attacked the precision of certain leases, and the Secretary conceded he could be more specific. 688 F.2d at 1303–04. The *Watt II* petitioners complained that the revised program still failed to indicate lease areas " 'as precisely as possible,' " 712 F.2d at 592 (quoting 43 U.S.C. § 1344(a)), but we held that the Secretary had by then satisfied the statute. *Id.* at 594. Although many of the arguments made by the *Watt II* petitioners are substantially similar to those made here, the *Watt II* petitioners made no mention of the phrase that petitioners here would have us believe speaks with compelling clarity and directness to the proper scope of the areas to be compared and offered for leasing under section 18. Petitioners explain that they attack the scope of the beginning point of the Secretary's analysis, not the precision of the result as did the *Watt II* petitioners, but that explains little. We intend no preclusion, of course; we only

illustrate that the import of the phrase "oil- and gas-bearing physiographic regions" is not self-evident.

We also have examined the Secretary's interpretation of the statute and found it permissible. The primary purpose of OCS-LA is expeditious, orderly development of the oil and gas resources of the OCS, with due consideration for the impact of that development and an equitable sharing of its risks and benefits. 43 U.S.C. §§ 1332, 1344. The statute sets only broad standards and leaves much to the Secretary's discretion in achieving its goals. *Watt I,* 668 F.2d at 1301. The statute directs the Secretary to consider and balance a variety of environmental and economic factors in developing his leasing program. 43 U.S.C. § 1344. The Secretary has attempted to draw planning areas at the program stage that facilitate those comparisons, as well as coordination with state and local governments, while offering leases of commercially feasible scope. The Secretary's administrative planning areas have previously withstood closely-related attacks on their size and precision. *See Watt II*, 712 F.2d at 591–94. The government need show no more than this to demonstrate the reasonableness of the Secretary's construction. Accordingly, we deny petitioners' requested relief on this issue and turn to a second issue relating to the scope of the Secretary's program.

2. Area Exclusion.[9]

OCSLA requires the Secretary to receive and consider nominations for areas to be leased or excluded. *See* 43 U.S.C. § 1344(f)(1); 30 C.F.R. § 256.16 (1978). About one hundred areas were nominated for exclusion; the Secretary excluded fifteen. OCSLA and the regulations promulgated thereunder do not require exclusion of nominated areas. Petitioners complain, however, that the Secretary was arbitrary and capricious in making exclusion decisions in that he (a) failed to articulate crite-

---

**9.** The Secretary uses the term "subarea deferral" for a decision to exclude an area from the current plan, but we use the term "area exclusion" to more closely follow the language of the statute. *See* 43 U.S.C. § 1344(f)(1). As we use the term, an "exclusion decision" may be one either to exclude or not. *See id.*

ria for and explain his decision-making process, (b) treated like areas differently without explanation, and (c) improperly considered non-statutory political factors in making exclusions offshore California. Petitioners seek a remand directing the Secretary to state and apply a clear set of criteria for excluding areas from the program. We address each of these in turn, as well as the government's challenge to petitioners' standing, and find that petitioners have standing to seek relief but no right to receive it.

■ a. *Ripeness and standing.* The government raises ripeness and standing challenges to petitioners' complaints about the Secretary's exclusion decisions. First, the government argues that the exclusion decisions are not ripe because they are not final, since petitioners complain, in the government's view, of the Secretary's failures to exclude nominated areas, and the Secretary may decide at subsequent stages of the OCSLA process not to lease lands that were nominated but not excluded at the present stage. The government does not contend that the entire plan is unreviewable, but asserts that exclusion decisions differ in this respect from, for example, planning area size. Accordingly, argues the government, the five-year plan does not impose an obligation, deny a right, or fix a legal relation and is therefore not final. *See generally NRDC v. Nuclear Regulatory Comm'n*, 680 F.2d 810, 815 (D.C.Cir.1982).

Review of the Secretary's approval of a section 18 leasing program is authorized expressly by the statute, 43 U.S.C. § 1349(c), and we fail to see any distinction regarding finality between exclusion decisions and other program-level decisions under section 18. The "nation-wide allocation of OCS activities is performed at the leasing program stage," *Watt I*, 668 F.2d at 1307, and the Secretary's exclusion decisions are reflected in the present program by the Secretary's inclusion or exclusion of the nominated areas in his inter-area com-

parisons. The Secretary's subsequent decision not to lease a particular area will not alter the schedule adopted, *see id.* at 1306, because the scope of decisions narrows as the OCSLA process proceeds from the present planning stage to lease and later stages. *See Watt II*, 712 F.2d at 592 ("pyramidic" structure of Act). Arbitrary or capricious decisions either to include or exclude [10] nominated areas, however, may materially affect the program-stage inter-area analysis. These decisions must be subject to program-stage review to ensure meaningful review of the program. Accordingly, we conclude that the exclusion decisions made by the Secretary in formulating his leasing program are sufficiently final for our review.

■ Second, the government contends that petitioners lack standing to seek review of the exclusion decisions because they have not yet been "adversely affected or aggrieved." 43 U.S.C. § 1349(c)(3)(B). The government contends that there has been no injury because petitioners' requests for exclusions have only been deferred for consideration at subsequent site-specific stages. The government's position sweeps too far; we can discern no meaningful difference between the injury asserted by petitioners as a result of the Secretary's exclusion decisions and the injury assertedly sustained (and which the government does not contest) by virtue of the other components of the leasing program.

The government also argues that petitioners lack standing because the court cannot give effective relief, since the Secretary is under no statutory duty to exclude additional areas, or, in fact, any areas at all. On remand, the Secretary might decide not to exclude any areas at this stage. While it is true that the remand petitioners now seek would not necessarily produce the ultimate relief of exclusion that petitioners undoubtedly seek, the government's argument "improperly assumes that the

---

**10.** The government concedes *arguendo* that a decision to exclude is final. Brief for Respondent at 46 n. 22. We note that the government's arguments on finality mischaracterize petition-

ers' arguments as complaints that the Secretary failed to exclude nominated areas; we understand petitioners' complaints to be more general. *See infra* pp. 303, 304–305, 306.

Secretary of the Interior would perversely refuse to adopt," *Watt v. Energy Action Education Association,* 454 U.S. 151, 161, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981), the product of his own reasoning process on remand if we were to find on the merits that the Secretary failed to make exclusion decisions on the proper basis. Accordingly, we find that petitioners have standing and turn to the merits.

■ b. *Criteria for Decision.* First, petitioners contend that the Secretary has failed to explain the criteria on which his exclusion decisions were made. Petitioners cite *Watt I,* 668 F.2d at 1311–12, to the effect that the Secretary has a heavy burden of justification for any claimed inability to articulate his consideration of statutory principles, and contend that he has not shown that he is unable, or that it is unusually difficult, to establish criteria for his decision to exclude nominated areas or not.

The Secretary acknowledges that his exclusion decision must be reasoned and that its basis must be identified, but contends that OCSLA does not require him to create a "formula" for exclusion decisions. We agree. The statute requires simply that the Secretary establish procedures for receiving and considering nominations. 43 U.S.C. § 1344(f). The Secretary has done so, but has not attempted therein to address the substance of the consideration. *See* 30 C.F.R. § 256.16 (1987). In these circumstances, our review is limited to an inquiry whether the Secretary's method is based on relevant considerations rationally applied. *See supra* p. 300. The record shows that, in the present program, the Secretary analyzed each area nominated for exclusion, considering its location and size, its treatment in previous programs, its oil and gas potential, its environment, and the adverse impacts that would be reduced or eliminated if the area were excluded. *See, e.g.,* PFP, Subarea Attachment at 1–3, J.A. at 1366–67 (Georges Bank Region). These considerations clearly are relevant to a decision whether an area should be excluded from the program, given OCSLA's goal of expeditious, orderly, equitably-shared development. *See* 43 U.S.C.

§§ 1332, 1344. The record shows further that, in general, the Secretary excluded areas that his analysis showed as low in resource potential and industry interest, while retaining areas that the available information, even if poor, made look "worthwhile" for further data collection in subsequent sale-specific stages. *See, e.g.,* Responses to Comments Provided in the Letter of May 7, 1986 from Governor of Massachusetts Michael S. Dukakis on the Proposed Program, enclosure accompanying letter from Secretary Hodel to Governor Dukakis of Massachusetts 2 (Apr. 24, 1987) ("Dukakis enclosure"), J.A. at 56. In addition, the Secretary excluded fully approved national marine sanctuaries regardless of their potential, and excluded some other areas having estimated potential on environmental-protection grounds. *Id.* at 3, J.A. at 57. Areas of moderate to high hydrocarbon potential or industry interest were not excluded, subject to possible exclusion in the subsequent pre-sale planning process. *Id.* at 2, J.A. at 56. These considerations, too, clearly are relevant to an exclusion decision. After making such exclusions, the Secretary then evaluated the remainder of each planning area in light of section 18 principles. The Secretary need not perform a section 18 analysis on areas he has determined not to lease. *Watt II,* 712 F.2d at 608.

Petitioners argue that *Watt I,* 668 F.2d at 1311–13, rejected such an unstructured "considerations" approach. The cited section of *Watt I,* however, simply faults that first program for not making the statutory section 18(a)(2)(G) inter-area comparison at all. Section 18(a)(2)(G) requires consideration of the "relative" environmental and marine productivity in scheduling leases "among" the various regions. The Secretary had made such comparisons within areas, but had not done so between areas because of perceived inter-area incomparability and other claimed difficulties. We held that the Secretary was under a heavy burden, and failed, to justify his claimed inability to fulfill the " 'explicit statutory design.' " *Watt I,* 668 F.2d at 1312 (quoting *Alabama Power Co. v. Costle,* 636 F.2d 323, 359 (D.C.Cir.1979)). The present case,

however, involves no such express direction. The subsection at issue requires the Secretary to receive and consider nominations for exclusion, but specifies no criteria or standards by which the Secretary is to proceed. Moreover, the passage upon which petitioners rely deals with an expressly required inter-regional comparison —a comparison we held in the same opinion is not required for areas that the Secretary has determined not to lease, as he clearly has done with respect to excluded areas. *See Watt II*, 712 F.2d at 608. In the absence of more specific congressional direction, it is sufficient that the Secretary's exclusion decisions are based upon rational consideration of identified, relevant factors. *See supra* p. 300. We find that the Secretary has done so.

c. *Adequacy of Explanation.* Second, petitioners complain that the Secretary's exclusion decisions are inconsistent and arbitrary because there is no analysis distinguishing areas excluded from those not excluded and no analysis of why he did not exclude areas nominated for exclusion. Petitioners cite illustratively the Secretary's exclusion of only part of the congressional moratorium area in the North Atlantic without explanation why that portion was excluded and the balance, including the Georges Bank fishery the moratorium was intended to protect, was not. Petitioners also cite the disparate treatment of nominated buffers offshore Monterey County (accepted) and Mendocino County (rejected), California, areas assertedly equivalent in resource potential and environmental sensitivity.

The government asserts that the Secretary's burden of explanation was met by his letters transmitting the Proposed Final Program to governors of affected states pursuant to subsections (c) and (d) of section 18. In pertinent part, those subsections require the Secretary to invite and consider suggestions from governors of affected states, tender the proposed program to them for pre-publication review and comment, reply in writing to gubernatorial requests for modification, "stating his reasons" for action taken on the suggestions, accept post-publication comments and recommendations from states and others, and submit such gubernatorial correspondence and comments to Congress with the plan, "indicat[ing] why any specific recommendation of ... a State ... was not accepted." 43 U.S.C. § 1344(c)–(d). His duty thereunder is simply to identify his legal or factual basis and to explain why he acted as he did. *Watt I*, 668 F.2d at 1321–22.

This the Secretary did. Those letters explain both the Secretary's general approach and the particular considerations in his decision not to exclude specific areas off the particular state. *See, e.g.*, Dukakis enclosure at 1–4, J.A. at 55–58; Responses to the Governor of California's Comments Provided in Letter of May 7, 1986, on the Proposed Program and in Letter of March 4, 1987, on the February 1987 Amalgamated Proposal, enclosure accompanying letter from Secretary Hodel to Governor Deukmejian of California 1–8, 20, 47–48 (Apr. 24, 1987) ("Deukmejian enclosure I"), J.A. at 69–76, 88, 137–38. As to the Georges Bank and California nominations particularly complained of by petitioners, we note that the Secretary explained he had decided not to exclude the entire Georges Bank because the areas not excluded appear to have some natural gas potential, a fuel the New England area has to bring in from elsewhere, and the adverse impacts appear to be manageable. The Secretary also noted the historic lack of production in the North Atlantic area in evident reference to the section 18(a)(2)(B) principle of equitable sharing. Dukakis enclosure at 3–4, J.A. at 57–58. The Mendocino County area was not excluded because of its potential and industry interest. Deukmejian enclosure I at 5, J.A. at 73. These explanations are not elaborate, but are sufficient to assure us that the Secretary's exclusion decisions are grounded in considerations relevant to the act. The record does not show any comparative analysis of the various areas nominated for exclusion, but we do not find that the statute requires such an approach.

d. *Political Considerations.* Third and final, petitioners cite as arbitrary

and capricious the Secretary's allegedly admitted consideration of "political" factors not embodied in section 18 in excluding certain areas. Specifically, petitioners complain that the Secretary admitted excluding certain areas off California in order to forestall opposition to the program by the California congressional delegation, then took refuge in his "very substantial range of discretion" in exclusion decisions and the direction to negotiate contained in section 111 of Public Law 99–951. *Stenographic Transcript of Hearings Before the Subcomm. on Panama Canal/Outer Continental Shelf of the House Comm. on Merchant Marine and Fisheries: Hearing on the Proposed OCS Five–Year Development Plan*, 100th Cong., 1st Sess. 29–32, 37–40, 59–60 (1987) (statement of Secretary Hodel) (unrevised and unedited copy), *reprinted in* J.A. at 179–82, 187–90, 209–10. The Secretary has stated that, as a result of the section 111 process, "we have made deferrals of subareas off California which we would not have made if we were guided by section 18 alone." Deukmejian enclosure I at 47, J.A. at 137. We do not agree that the Secretary's statements evidence arbitrary and capricious conduct within our power to address. The Secretary was expressly authorized by section 111 to "consider and accept ... any recommendation" by the Governor of California or co-chairman of the congressional panel. Pub.L. No. 99–591, § 111, 100 Stat. 3341–261 (1986) (pamphlet pagination). As we note elsewhere, *infra* p. 319 n. 34, section 111 itself provides no standards for review and does not incorporate those of section 18, leaving us with no basis for review of the Secretary's decisions to exclude that arise out of the section 111 process. Since the Secretary's apparent mandate under section 111 is to work toward a political consensus, we cannot find that the process is arbitrary and capricious.

C. *Section 18(a)(3): Cost–Benefit Analysis*

■ Petitioners next claim that the Secretary, in preparing the five-year program, failed to comply with section 18(a)(3) of OCSLA. That section provides:

> The Secretary shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

43 U.S.C. § 1344(a)(3). The Secretary reads this subsection to instruct a cost-benefit analysis, and this court has endorsed the Secretary's interpretation. *Watt I,* 668 F.2d at 1318. The Secretary's cost-benefit analysis begins with a calculation of each planning area's "net social value." PFP, SID at 78, J.A. at 1089. Net social value is "net economic value" (the market value of expected resources less the cost of production and transportation) minus "social costs" (environmental and socio-economic costs). Petitioners maintain that the Secretary violated section 18(a)(3) by: (1) failing to utilize a proper calculation of net economic value; and (2) undervaluing social costs. We conclude, after full consideration of petitioners' arguments, that the Secretary's analysis satisfied section 18(a)(3)'s instruction.

1. Calculation of Net Economic Value

Petitioners claim that had the Secretary genuinely calculated and employed net economic value, he would have excluded more areas from the program in light of the dramatic drop in world oil prices. There is a presumption that an area should be included on the schedule if the expected net social value is positive, *i.e.,* if the anticipated benefits of oil and gas activities in that area exceed the expected costs.[11] Lowering oil price estimates in the benefit calculation reduces net economic value and, correspondingly, net social value. At the time the program was finalized, the price of oil had dropped to $19 per barrel. Brief for Petitioners at 55. The Secretary's own

---

**11.** PFP, SID at 78, J.A. at 1089. It is also presumed "that the most valuable areas should be

offered first and most frequently." *Id.*

mode of economic analysis, petitioners say, indicates that at $19 per barrel, ten of the twenty-two planning areas would have a zero net economic value. PFP, SID, App. F at 75, J.A. at 1189. Petitioners complain that the program "simply did not change as oil prices ... plummeted." Reply Brief for Petitioners at 20 n. 11.

The Secretary responds, satisfactorily in our judgment, that (1) the estimates of net economic values for planning areas are used for comparative purposes—to compare the relative benefits among the various areas—and not for the purpose of determining the absolute economic values of oil and gas that might exist, (2) the Secretary properly focused on long-term considerations and price expectations, not on short-term prices frozen on a particular date, and (3) the Secretary legitimately retains flexibility by including many areas at the program stage, subject to deletion at a later stage.

The Secretary recognized the uncertainties inherent in his net economic value calculations and therefore did not rely on the absolute values of his estimates, but used them relatively or comparatively to rank the planning areas by groups. PFP, SID at 46, J.A. at 1072; *see Watt II*, 712 F.2d at 605 (observing that the Secretary "was cautious as to the extent he relied on his [cost-benefit] analysis," which he "realized ... should be used only for generalized conclusions"). In deciding whether to include an area, the Secretary weighed qualitative as well as quantitative factors. PFP, SID at 78–82, J.A. at 1089–91. The Secretary listed among qualitative factors "national security, industry interest, and equitable sharing of developmental costs and benefits." *Id.* at 48, J.A. at 1073. OSCLA specifically directs the Secretary to weigh such qualitative factors in his balance. 43 U.S.C. § 1344(a)(2)(B) (equitable sharing of benefits and risks), (E) (expressions of industry interest).

Taking qualitative factors into account implies that the inclusion of areas with a calculated net social value of zero may nonetheless be compatible with section 18(a)(3). PFP, SID at 46–48, J.A. at 1072–

73. In fact, the areas that petitioners claim should have been excluded were included by the Secretary explicitly on the basis of qualitative factors, primarily "the volatility of oil prices and the limits on predicting them" and the "flexibility" gained by inclusion. *Id.* at 118, J.A. at 1109. We turn next to the reasonableness of the reliance placed on these factors.

The recent drop in current oil prices, the Secretary maintains, is not a secure indicator of the level of prices relevant to the leasing decision—future oil prices. Lease sales under the 1987–1992 program will yield oil production that commences no earlier than 1992 and may extend for decades. *Id.* at 38–40, 48, J.A. at 1068–69, 1073. The Secretary made calculations based on a wide range of estimates, because future prices, and how they are arrived at, are matters upon which expert forecasting groups disagree. *Id.* at 37–38, J.A. at 1068; PFP, SID, App. F at 91, J.A. at 1197.

In preparing the five-year program, the Secretary could reasonably assume—and plan on the basis of—higher future prices, even in the face of current price declines. We emphasize here that while "findings of ascertainable fact" must be supported by "substantial evidence," *Watt I*, 668 F.2d at 1302, for matters "largely predictive in nature," this court accords "great deference" to the Secretary. *Watt II*, 712 F.2d at 600, 602 (Secretary, in predicting future oil prices, was "free to use his expertise to accept the one percent growth rate which the study [he relied upon] stated was within the realm of possibility," although that study predicted that a three percent rate was most likely). "It is not our function," the *Watt II* court recalled, "to resolve disagreements among the experts or to judge the merits of competing expert views." *Id.* at 606.

Petitioners maintain, however, that long-term projections of oil prices begin with a particular starting price. Reply Brief for Petitioners at 22 & n. 15. Projections of future oil prices derive from a starting price and a projection of a long-term trend from that price. Starting from relatively low current oil prices, petitioners assert,

leads to relatively low future oil prices despite a long-term rising trend.

Petitioners misconceive the role of a starting price in the net economic value calculation if they assume that the starting price must be the current price. "The stipulated starting prices are simply a convenient way to index the entire vector of relevant future prices." PFP, SID at 40, J.A. at 1069. A starting price embodies a particular set of assumptions, such as the level of OPEC market power. PFP, SID, App. F at 91, J.A. at 1197. A low level of market power today is not a reliable predictor of a low level in the future. The Secretary reports using starting prices ranging from $14 to $29 per barrel, *id.* at 75, J.A. at 1186; PFP, SID at 42, J.A. at 1070, and was mindful that, in the view of many experts, "the longer current prices stay relatively low, the more likely it is that future prices will rebound faster and to higher levels, due primarily to the increased consumer demand for oil brought about by the lower prices." PFP, SID at 38, J.A. at 1068. Given the large uncertainty surrounding this issue, we cannot gainsay the Secretary's position.[12]

The Secretary underscores that he gains needed flexibility by including many areas in the program at the start, with the prospect of deferring or eliminating scheduled sales if circumstances later indicate low value. PFP, SID at 48, 118, J.A. at 1073, 1109. An area excluded from the program cannot be leased, 43 U.S.C. § 1344(d)(3), absent revision of the schedule under section 18, a relatively cumbersome process likely to run two or more years.

Petitioners nevertheless urge that the Secretary must use the section 18(e) procedure to achieve "flexibility." Reply Brief for Petitioners at 23–24. They cite H.R. Rep. No. 590, 95th Cong., 1st Sess. 151, *reprinted in* 1978 U.S.Code Cong. & Admin.News 1557, which states: "An annual review is to assure that the program fully reflects updated information and changing conditions." The legislative history petitioners recite, however, does not support the claim that the Secretary may respond to new information and changing conditions only via the section 18(e) route.

Rather, as *Watt I* and *Watt II* read OCS-LA, the statute authorizes a broad five-year plan that will be pared down in successive stages. As *Watt I* stated, OCSLA is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." 688 F.2d at 1297. This court also observed in *Watt II*, 712 F.2d at 588: "Additional study and consideration is required before each succeeding step is taken. Thus, while an area excluded from the leasing program cannot be leased . . . , an area included in the program may be excluded at a latter [sic] stage." The five-year program is "the first, and thus broadest-based, portion of the process." *Id.*

This logic cannot be taken too far, of course, lest the Secretary include the entire OCS in the program, and reserve for later his choices among leasing areas. The Secretary must make a good-faith effort to balance environmental and economic interests. So long as he proceeds reasonably,

---

**12.** Petitioners also charge that the Secretary's reasoning in the net economic value calculation is inconsistent with his rationale for a lower minimum bid. The Secretary has stated that lower oil prices, *inter alia,* have reduced the "fair market value" required by section 18(a)(4). PFP, SID at 85, J.A. at 1092; *see infra* pp. 313, 314. Petitioners argue that "the Secretary is trying to have it both ways." Reply Brief for Petitioners at 23. If net economic value is not reduced by the current fall in oil price, then neither should that price drop affect minimum bids.

The two concepts, however, are used at two different stages in the leasing process and for correspondingly different purposes. Net eco-

nomic value is estimated now to plan broadly for the future location and timing of leasing. Fair market value is determined by known market conditions at the time of lease sale. PFP, SID, App. K at 7, 20, J.A. at 1326, 1333. When oil prices are volatile, it may be prudent to use a high-price assumption so as to keep marginal lease sales in the program, while retaining the option of lowering minimum bids to respond to conditions in fact existing at the time of sale. Both policies enhance the Secretary's flexibility to adjust to changing conditions. We note, moreover, that the minimum bid plays only a secondary role in securing receipt of "fair market value." *See infra* pp. 312–314.

however, his decisions warrant our respect. Section 18(a)(3) "does not mandate any particular balance, but vests the Secretary with discretion to weigh the elements so as to 'best meet national energy needs.'" *Watt I,* 668 F.2d at 1317.[13] Particularly when "insufficient data is presently available to make a fully informed factual determination," his decisions have a legislative cast; they "depend to a greater extent upon policy judgments and less upon purely factual analysis." *Id.* at 1301.

In sum, the span of expert forecasts reveals the predictive insecurity confronting the Secretary. *See* PFP, SID at 37–38, J.A. at 1068; PFP, SID, App. F at 91, J.A. at 1197. The statute permits him, in these circumstances, to act on the basis of plausible—albeit high—price projections and thereby implement a policy that favors inclusion at the program stage. We have been shown no compelling cause to require him to revisit this portion of his decision.

### 2. Calculation of Social Costs

Petitioners argue that the Secretary undervalued environmental costs in five specific respects. On examination of these arguments, we find none of them persuasive.

First, petitioners claim the Secretary erroneously assumed that oil produced from the OCS will "back out" foreign oil barrel for barrel, PFP, SID, App. G at 22, J.A. at 1219, thus reducing oil spill costs. Petitioners call this assumption "totally unfounded," backed by "no empirical data" or "economic analysis." Brief for Petitioners at 59.[14]

We state at the outset the Secretary's logic: "Because every barrel of oil produced on the OCS will be consumed in the

United States, each new domestic barrel will displace a barrel of oil that otherwise would be imported from abroad." Brief for Respondent at 85. Responding to petitioners' objections, the Secretary stated:

> The specific assumption that OCS oil will replace imported oil barrel for barrel is quite reasonable. The additional OCS oil produced under the 5–year program typically will not affect the domestic price of oil, which is set though imperfectly on the world market most of the time by OPEC's curtailing production. Hence, domestic energy consumption and production from other sources will be unaffected. Production of OCS oil will replace the marginal supply, imports.

Responses to Comments Provided in Letter of May 7, 1986, from Governor of California George Deukmejian and from Local Governments on the Proposed Program, enclosure accompanying letter from Secretary Hodel to Governor Deukmejian of California 22 (Apr. 24, 1987) ("Deukmejian enclosure II"), J.A. at 112.

The Secretary's "backing out" assumption is a rough estimation that would prove wrong (1) to the extent that some of the OCS production is exported,[15] or (2) to the extent that OCS production is significant enough to depress world oil prices and thereby increase domestic consumption of oil. Petitioners do not suggest that either scenario is likely, and they point to no evidence from which we could conclude that the "backing out" assumption is significantly inaccurate. We therefore hold to the view that the Secretary's "'decision as to how much analysis is necessary'" is not "'obviously incorrect.'" *Watt II,* 712 F.2d at 600 (quoting *Watt I,* 668 F.2d at 1317 n.

---

**13.** Petitioners argue that, far from supporting the Secretary, *Watt I,* 668 F.2d at 1304, rejected a flexibility argument similar to the one the Secretary presents here. Reply Brief for Petitioners at 23. But the issues involved are dissimilar. The portion of *Watt I* petitioners feature entailed a specific statutory instruction: identify the location of leasing activity "as precisely as possible." *Watt I,* 668 F.2d at 1304. Here, the Secretary's ultimate task is to balance, not to define or describe.

**14.** Petitioners point to the Secretary's projections of rising oil imports over 1990–2010 as evidence that imports will not be "backed out." Brief for Petitioners at 59–60 (citing PFP, SID, App. F at 11, J.A. at 1157). The Secretary's projection, however, does not refute the "backing out" theory, for under his analysis, imports would be *still higher* in the absence of OCS production.

**15.** Under certain conditions, 43 U.S.C. § 1354 permits such exports.

124 (quoting *Massachusetts v. Andrus,* 594 F.2d 872, 886 (1st Cir.1979))).

Petitioners also contend that even if "backing out" generally would occur as assumed, this phenomenon need not imply lower oil spill costs. OCS oil may also be carried by tankers, and the Secretary assumed that foreign and domestic tankers have the same spill rates. Brief for Petitioners at 60 (citing PFP, SID, App. G at 22, J.A. at 1219). The record, however, supports the Secretary's conclusion that "backing out" would reduce oil spill costs. The Secretary did consider the possibility that some OCS oil will be carried by tanker, but because *all* imported oil is carried by tanker, OCS oil would still involve lower spill risks. PFP, SID, App. G at 2–3, J.A. at 1209. Furthermore, although the Secretary assumed all tankers would have the same spill *rates,* he also reasonably assumed domestic tankers would produce smaller spills than foreign tankers, based on spill statistics for 1957 to 1985. PFP, SID, App. G at 5, 19–22, 59–60, J.A. at 1211, 1218–19, 1238.

Second, petitioners claim that the Secretary has grossly undervalued OCS biological resources. They point to a study by Richard Tinney submitted to the Secretary by the California congressional delegation.[16] The Tinney study gave high estimates of the value of California's OCS biological resources. Petitioners complain that the Secretary's response, Letter from Secretary Hodel to Governor Deukmejian of California (Apr. 24, 1987), J.A. at 64–163, offered an inadequate explanation for not adopting the Tinney figures. Brief for Petitioners at 62.

We find in the Secretary's response, however, a reasonable explanation of why the Tinney figures cannot be compared with the Secretary's. The Tinney study estimates the total value of all OCS resources; it does not estimate how much of this value would be lost as a result of OCS leasing.[17] Petitioners do not directly compare the Tinney figures with those used by the Secretary, nor do they explain exactly how the Tinney study should have informed the Secretary's evaluation.

Third, petitioners complain that "serious questions have been raised" about the Secretary's assumption that social costs will be far greater if an oil spill comes ashore. Brief for Petitioners at 62. Petitioners argue that this assumption, made at PFP, SID, App. G at 5–6, J.A. at 1211, "minimizes" the harm to living resources caused by offshore spills; petitioners describe this harm in qualitative terms in their comments.[18]

The record, however, indicates that the Secretary adequately considered the effects of offshore spills and made reasonable assumptions. The Secretary analyzed these effects in the Final Environmental Impact Statement. FEIS IV.A.–57–72; IV. B.1.–14–16; IV.B.10.–29–32, –50–52; IV.B. 22.–10–11, –19–20. Furthermore, he explained that a spill that comes ashore "requires costly onshore removal operations and imposes a variety of additional costs, such as recreation losses, not associated with spills which stay at sea." PFP, SID, App. G at 5, J.A. at 1211. The Secretary used "available case studies of oil spill costs, modified by information from prior OCS lease sale EIS's and other sources" as

16. Brief for Petitioners at 61 (citing Tinney, An Estimate of the Values of the Environmental Resources of the Central and Northern California Coast, J.A. at 875–916, *attached to* Comments on the Draft Proposed Program for Offshore California transmitted through Sen. Wilson, *et al.,* to Secretary Hodel (Mar. 4, 1987), J.A. at 866–74).

17. Deukmejian enclosure II at 43, J.A. at 133; Responses to Congressman Panetta's Proposal for Leasing Offshore California and Responses to Comments Provided in Congressman Panetta's March 4, 1987, Letter on the February 1987 Amalgamated Proposal, enclosure accompanying letter from Secretary Hodel to Governor Deukmejian of California (Apr. 24, 1987), J.A. at 160.

18. *See, e.g.,* Comments of the Natural Resources Defense Council on the Department of Interior's Proposed 5–Year OCS Leasing Program for California 26–27 (Feb. 25, 1987) ("NRDC Comments"), J.A. at 978–79, *attached to* Comments on the Draft Proposed Program for Offshore California transmitted through Sen. Wilson, *et al.,* to Secretary Hodel (Mar. 4, 1987), J.A. at 866–74.

the bases for his oil spill cost coefficients. *Id.* at 6, J.A. at 1211. Petitioners cite no study supporting their "serious questions" regarding the Secretary's analysis; their criticism again lacks the cogency and force necessary to show that the Secretary's approach was unreasonable, arbitrary, or capricious.

Fourth, petitioners assail the Secretary's estimates of air quality costs as too low. Brief for Petitioners at 63. His estimates were based on a ten-year-old study, and they amounted to 3.6 cents per barrel of OCS production. *Id.* at 42, J.A. at 1229. Petitioners urged that the Secretary instead use the costs of mitigating the impact on air quality, pointing to the claims of Exxon that it would cost $1.7 billion to offset one OCS project. Letter from Attorney General Van De Kamp of California to Secretary Hodel 9–10 (Mar. 2, 1987), J.A. at 863–64. Petitioners claim that the Secretary offered no adequate explanation for refusing to use such figures, which would have resulted in much higher social cost estimates.

Petitioners are correct that it would be irrational to ignore mitigation costs. It appears, however, that the Secretary took these costs into account in a reasonable manner. Under his methodology, air quality costs reflect the net cost of emissions *after* mitigation. PFP, SID, App. G at 42, J.A. at 1229. Mitigation costs, in the Secretary's calculus, are private costs, which are excluded from the definition of social costs. *Id.* at 2, J.A. at 1209. Costs of complying with air quality regulations are instead counted as operating costs to the lessee and thus are factored into net economic value calculations. *Id.* at 8, J.A. at 1212. These costs were implicit in the private cost estimates used by the Secretary, PFP, SID, App. F at 85, J.A. at 1194, for those esti-

mates were based on actual capital and production costs of existing platform facilities subject to pollution control regulations, *e.g.*, 30 C.F.R. § 250.57 (1987) (added by 45 Fed.Reg. 15,128 (1980)); Stipulation No. 15, OCS Lease Sale 73, Central California, 48 Fed.Reg. 50,015–16 (1983).

Fifth, petitioners assert that the Secretary undervalued wetland losses. Petitioners claim in their comments that a study by Robert Costanza and Stephen Farber estimated the value of Louisiana wetlands at $2,429 to $6,400 per acre *per year*.[19] Petitioners claim that the Secretary unjustifiably continued to use lower figures, such as losses of $20,898 per acre in Central California. Brief for Petitioners at 64 (citing PFP, SID, App. G at 49, J.A. at 1233).

The record shows, however, that the Secretary considered the Costanza and Farber study specifically. The Secretary summarized the Costanza and Farber results as estimates of $2,429 to $8,977 in (1983 dollars) present value terms, depending on the discount rate used.[20] These estimates, attributed to the Costanza and Farber study, are well *below* the Secretary's estimates, and the Secretary reasonably opted to use his own higher-cost figures. PFP, SID, App. G at 47–48, J.A. at 1232.

In conclusion, having reviewed petitioners' multiple challenges to the Secretary's cost-benefit analysis, we are satisfied that, in each instance, the Secretary adequately explained his methodology and that his conclusions "'were reasonable and supported by the record.'" *Watt II*, 712 F.2d at 606 (quoting *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1160 (D.C.Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980)). We therefore reject as unsubstantiated petitioners' claims of section 18(a)(3)

19. NRDC Comments at 27–28, J.A. at 979–80 (citing Costanza & Farber, The Economic Value of Coastal Wetlands in Louisiana, Final Report to the Coastal Protection Section, Louisiana Dep't of Natural Resources (Sept. 1985)).

20. PFP, SID, App. G at 49, J.A. at 1233 (citing Costanza & Farber, *supra* note 19, at 31). If petitioners dispute this reading of the Costanza and Farber study, the burden is on them to

show on the record that the Secretary was mistaken. Petitioners did not attach the original study to their comments, so the study itself does not appear in the record. Nor have petitioners cited any comment claiming that the SID is in error. In short, petitioners produce nothing that could lead this court to find the Secretary's calculations unreasonable.

transgressions.[21]

### D. Section 18(a)(4): Minimum Bid Analysis

■ Petitioners next assert that the program runs afoul of section 18(a)(4)'s requirement that "[l]easing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government." 43 U.S.C. § 1344(a). "Fair market value" is thus a pivotal term in the statutory scheme. In the current program, the Secretary has embraced the 1982–87 program's definition of the term: "'Fair market value' is ... the amount in cash ... for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obligated to buy." PFP, SID, App. K at 2–3, J.A. at 1324; see Watt II, 712 F.2d at 606. The Watt II court accepted this definition, which evaluates fair market value in terms of current market conditions. In so doing, the court noted that section 18(a)(4) "does not mandate the maximization of revenues, it only requires receipt of a fair return." 712 F.2d at 606.

Petitioners attack the element of the program that allows the Secretary to depart from the standard minimum bid level of $150 per acre on a sale-by-sale basis. See, e.g., PFP, SID at 6b, J.A. at 1052. A similar provision existed in the 1982 program, id. at 85, J.A. at 1092, although the Secretary conducted all sales, save one, under the prior program with a minimum bid price of $150 per acre. Request for Secretarial Action 4, J.A. at 1399. To petitioners' distress, the Secretary has established a minimum bid price of $25 per acre for the initial sales under the 1987

Program. See id.; Brief for Petitioners at 71–72. Petitioners argue that the Secretary has violated section 18(a)(4) "by reserving to himself the unbridled discretion to reduce the minimum bid per acre leased from $150 to $25 in indivi[d]ual lease sales." Brief for Petitioners at 66.

More specifically, petitioners' challenge consists of three related arguments: that the high minimum bid level ($150 per acre) is crucial to assuring receipt of fair market value and, as such, was an important predicate to Watt II's approval of the Secretary's measures designed to comply with section 18(a)(4); that the new minimum bid review provision violates the statute because the program articulates no criteria to guide the Secretary's departures from the baseline level of $150 per acre; and that under the guise of the reconsideration provision, the Secretary is actually implementing a Presidential directive to set the minimum bid price at $25 per acre, in disregard of the statutory duty to assure receipt of fair market value.

In considering these arguments, we are called upon to apply a "quite deferential" standard of review, Watt II, 712 F.2d at 590. The reason is that, in essence, petitioners are attacking the Secretary's policy judgment that a leasing program containing this discretionary feature will (in tandem with the bidding process and evaluation procedures) assure receipt of fair market value. Although the overarching mandate to receive fair market value is statutory, the Secretary must nonetheless use his judgment and expertise to construct the particular procedures and methodology that will satisfy the pertinent statutory mandates. In view of the generous standard of review applicable to Secretarial policy judgments under OSCLA, see supra p.

---

**21.** In case numbers 87–1434 and 87–1440, the states of Oregon and Washington complain that there is inadequate data on environmental risks to support the Secretary's determination to let a "frontier exploration sale" occur in the Washington–Oregon planning area. We previously have recognized that the Secretary at the program stage must proceed on "the best 'existing information' available to him," Watt I, 668 F.2d at 1313 (quoting 43 U.S.C. § 1344(a)(2)(A)), even though the process may be "highly specula-

tive." Id.; see also Watt II, 712 F.2d at 596. We also previously have recognized the primary purpose of expeditious development under the statute and the Secretary's broad discretion in striking the section 18(a)(3) balance. Watt I, 668 F.2d at 1316–17. Accordingly, after fully considering the arguments of Oregon and Washington and reviewing the record, we conclude that there is no cause to disturb the Secretary's determination; we therefore deny these petitions.

300, and for the reasons that follow, we reject petitioners' various contentions.

### 1. Minimum Bid Price

Petitioners' first line of attack (against the program's allowance of departure from the $150 per acre minimum bid price) vastly exaggerates the role of the minimum bid price in assuring receipt of fair market value. Recognition of the limited office the minimum bid policy actually serves in assuring receipt of fair market value (and the even lesser role that the particular minimum bid price of $150 per acre plays) leads us to reject petitioners' general attack and shapes our consideration of their remaining two challenges.

In the current program, as in the preceding one, the Secretary assures the government's receipt of fair market value for OCS leases primarily through two mechanisms: first and foremost, the competitive bidding process itself, and, second, post-bid evaluation procedures designed to measure the value of tracts independently when market forces are least likely to provide a reliable indication of value. See PFP, SID, App. K at 5–10, J.A. at 1325–28. The minimum bid price, in turn, furthers a range of policy goals (e.g., rate of development, intensity of exploration, maximization of revenues), and helps assure receipt of fair market value by buttressing both of the primary mechanisms.[22] However, the minimum bid policy is clearly a minor and subsidiary means of meeting the section 18(a)(4) duty. Indeed, in the course of rejecting arguments that the 1982 program violated section 18(a)(4), Watt II emphasized that the bidding process and evaluation procedures constitute the principal measures for fulfilling the section 18(a)(4) mandate: "[T]he proposed evaluation process, coupled with the Secretary's reasonable reliance on the integrity of the competitive bid process, is sufficient to assure that the fair market value is received. The statute requires nothing more." Watt II, 712 F.2d at 608 (citation omitted).

Notwithstanding Watt II's teaching, petitioners argue that that decision nonetheless compels retention of the higher minimum bid price as a crucial element of the measures designed to assure receipt of fair market value. Not so. To the contrary, Watt II at one point suggests that reasonable reliance on competitive bidding processes alone went far toward meeting the statutory duty, 712 F.2d at 607; in addition, as we just noted, Watt II concludes that "[t]he statute requires nothing more" than the two primary mechanisms of the competitive bidding process and post-bid evaluation procedures. Id. at 608. To be sure, Watt II refers to and relies upon the (then) recently increased minimum bid price, but only as "added insurance" for the operation of the bidding process and as a safeguard to an untested evaluation procedure, id. at 607 & n. 115. The latter has since been tested, evaluated by the General Accounting Office, and significantly expanded. See PFP, SID, App. K at 7–10, J.A. at 1326–28; Brief for Intervenors (API) at 23. These improvements, along with changed market conditions, could reasonably be viewed by the Secretary as rendering the higher minimum bid price even less important to the current program than the higher price was to the predecessor program. In short, Watt II is devoid of any suggested requirement that the Secretary cannot allow deviation from the higher minimum bid price; moreover, that decision comports fully with our conclusion that the program fulfills the section 18(a)(4) requirements principally through the Secretary's reliance upon the competitive bidding process and the post-bid evaluation procedures.

Equally fundamental, the nature of section 18(a)(4)'s "fair market value" concept suggests the relative lack of importance of the particular minimum bid price ($150 per acre) or indeed of any fixed minimum bid price at all. The fair return that the Secretary must secure depends, obviously, upon current market conditions, and the Secretary can, in accord with section 18(a)(4),

---

**22.** The minimum bid level structures the level and amount of bidding and influences which

tracts will be subject to the Department's evaluation procedures. Id.

alter the minimum bid price in an effort to create a functioning lease market. Far from betraying the section 18(a)(4) mandate and the *Watt II* rationale, the sale-by-sale review provision is an appropriate way to allow the Secretary to create a fair market and to assure receipt of a fair return. Courts are understandably loath to cabin the Secretary's discretion when elaborate and calculated safeguards already exist to fulfill the section 18(a)(4) requirement. Because the competitive bidding process and elaborate post-bid evaluation of bids on those tracts most susceptible to market failure form those safeguards, the program may, we are persuaded, properly allow the Secretary to shift the particular minimum bid price on a sale-by-sale basis without running afoul of section 18(a)(4).

### 2. Secretarial Discretion

Petitioners' second (and principal) argument is that the program violates section 18(a)(4) because the Secretary has "reserv[ed] to himself the unbridled discretion to reduce the minimum bid per acre." Brief for Petitioners at 66. We find it unnecessary to address petitioners' unargued assumption that section 18(a)(4) does in fact bar such "unbridled discretion." [23] In light of how the competitive bidding process and evaluation procedures amply fulfill section 18(a)(4)'s mandate, section 18(a)(4) can reasonably be read to require at most a listing of criteria that would channel the Secretary's discretion in setting the minimum bid price. But that

requirement is amply met here. The Secretarial Issue Document discusses the methodology and factors used to determine fair market value, and asserts that the Secretary employs "the same type of technique" to ensure that the minimum bid price assures receipt of fair market value.[24] Additionally, the Secretary has set forth the market conditions and other concerns that may lead him to lower the minimum bid price. *See, e.g.,* PFP, SID at 85–86, 168–70, J.A. at 1092–93, 1134–35; C. Hartgen, M. Rose & L. Slaski, *Minimum Bid Policy* 5, 7–8 (Dec. 1, 1986) (M.M.S. study), Index Supp. I at 5, 7–8. Notices soliciting comments to the Department's minimum bid analysis also suggest bases for lowering the minimum bid price. 51 Fed.Reg. 39,810, 39,811 (Oct. 31, 1986); 51 Fed.Reg. 5110 (Feb. 11, 1986).[25] Taken together, these criteria abundantly satisfy any statutory obligation to articulate criteria to guide the Secretary in the exercise of his discretion.

### 3. Presidential Letter

Petitioners' third and final claim in this respect is that the Secretary has arbitrarily reduced the minimum bid price in response to a letter from the President to Congress promising to set the minimum bid price at $25 per acre.[26] Petitioners emphasize that, in the wake of the President's letter, the Secretary "subsequently set the bid at [$25 per acre] for all tracts in all sales." Reply Brief for Petitioners at 33; *see* Brief for Petitioners at 71–72. They contend that by

---

**23.** The government argues that, given the measures the Secretary has implemented to assure receipt of fair market value, section 18(a)(4) cannot reasonably be read to require additional delineation of criteria guiding departure from the $150 per acre minimum bid price. Brief for Respondent at 104–05, 107.

**24.** From the Government's point of view, the measures developed using the same type of technique result in an estimate of the value which, on a lease-specific basis, is used as an initial step in estimating the minimum acceptable bid in order to judge whether the high bid received meets the fair market value requirement.
PFP, SID, App. K at 5, J.A. at 1325.

**25.** Petitioners' argument that these solicitations impermissibly exceed the bounds of the pro-

gram is unpersuasive. The Secretary's solicitation of comments seems both an integral part of the ongoing, case-by-case review established by the program, and a desirable contribution to establishing and refining the bases for, and form of departure from, the $150 per acre minimum bid baseline.

**26.** In a May 6, 1987 letter to Congress, President Reagan stated that, as part of measures to reduce the nation's dependence upon imported oil, "I also am reducing the minimum bid requirement for Federal offshore leases from $150 per acre to $25 per acre, which will encourage exploration and development by reducing the up-front costs." J.A. at 1733 (entire statement regarding minimum bid policy).

following a directive from the President, to whom the statute assigns no authority to determine fair market value, the Secretary has impermissibly abandoned his own program decision establishing the higher minimum bid price and has thereby disregarded section 18(a)(4)'s mandate to assure receipt of fair market value.

To the extent that petitioners attack the Secretary's minimum bid pricing for particular lease sales, their challenge is obviously premature. To the extent that petitioners attack the program's provisions or formulation, their challenge falls short, for reasons we shall now set forth.

The challengers' basic argument—that the Secretary has acted *in response to* the Presidential directive—is belied by the facts of record. First, the Secretary represents that he retains and continues to follow the program provision for a $150 per acre minimum bid price, subject to sale-by-sale review (which has, to be sure, recently been exercised). Nothing has been brought to our attention that convincingly suggests the contrary at this stage. Second, the provision for reviewing the minimum bid price on a sale-by-sale basis (and the bases for the Secretary's decision to set lower minimum bid prices) *preceded* the President's letter. The Secretary is obviously not unaware of the President's expressed preference and indeed candidly admits that in setting the minimum bid price, the Department will consider this preference along with other factors. *See Request for Secretarial Action, supra,* J.A. at 1399. However, we think it more plausible that the Secretary's minimum bid pricing has responded to a variety of factors consistent with section 18(a)(4) and has properly been developed within the context of the program, as opposed to being a compliant response to a White House directive. At least one minimum bid pricing decision at the $25 per acre level *preceded* the President's letter, as did the notices for comments on contemplated, case-by-case reductions of the minimum bid price, 51 Fed.Reg. 39,810 (Oct. 31, 1986); 51 Fed. Reg. 5110 (Feb. 11, 1986), the revised minimum bid policy paper, *supra,* Index Supp. I (Dec. 1, 1986), and the indications in the program drafts that lower minimum bid levels may be appropriate (the Proposed Program was issued in February 1986, and the Proposed Final Program was issued in April 1987). This temporal reality obviously detracts significantly from the argument that the Secretary was merely hewing to the presidential line.

In this regard, the parties joust over our decision three years ago in *Center for Auto Safety v. Peck,* 751 F.2d 1336 (D.C. Cir.1985). Brief for Respondent at 108; Reply Brief for Petitioners at 33–34. That case indicates that a presidential direction to an agency to disregard its statutory mandate or criteria is improper (as one might well suspect), but that an agency which properly formulates policies or makes decisions that accord with the President's wishes is acting in a permissible, even laudable fashion. 751 F.2d at 1368–69. The challengers in *Center for Auto Safety* could show only that the agency expected "that the President would be pleased if the agency ended its rulemaking by reducing the existing standard, and disappointed if it left the current rule in effect." *Id.* at 1369. While in the present case the Secretary has not engaged in "painstaking and intricate analysis" comparable to NHTSA's rulemaking at issue in our prior decision, *id.,* the Secretary in his sale-by-sale review stands in a similar position in relation to the President. The program authorizes and guides the Secretary's review. Petitioners have made no showing that the particular minimum bid price reductions do not assure receipt of fair market value, much less that, in allowing such review, the program violates the statute. That the program permits the Secretary to heed the President's desires as the Secretary reconsiders minimum bid pricing for particular sales should be no source of discredit, so long as that review assures receipt of fair market value in light of prevailing market conditions. As we have already discussed, the program does assure that the Secretary will receive fair market value for lands leased, and nothing in the record or in petitioners' arguments convinces us that the program, in formulation or

form, runs afoul of section 18(a)(4)'s mandate.

## V. PUBLIC LAW 99–591

The People of the State of California, supported by *amici*, mount a separate challenge to the Secretary's off-shore leasing program under section 111 of Public Law 99–591. Continuing Appropriations Act, Fiscal Year 1987, Pub.L. No. 99–591, § 111, 100 Stat. 3341, 261–62 (1986) (pamphlet pagination) (section 111). Section 111, the text of which is set out in the margin,[27] authorizes the Secretary to consider and accept any proposal regarding California OCS leasing made by a congressional negotiating group or the Governor of California.[28] *Id.* § 111(a). In particular, it directs the Secretary to "indicate in detail why any specific portion of the proposals ... was not accepted" and to include this response along with his submission of the final OCS program to the President and Congress. *Id.* § 111(b).

▆ In petitioners' view, the Secretary failed to fulfill the mandate of section 111. Their contention is straight-forward, namely that adequate explanations were not provided for the Secretary's rejection of portions of three particular proposals.[29] For

---

**27.** Section 111 of Pub.L. No. 99–591 provides:

(a) The Secretary of the Interior may consider and accept, as part of the Outer Continental Shelf oil and gas leasing program for 1987 to 1992, any recommendation included in any proposal submitted to him with respect to lease sales on the California Outer Continental Shelf by the co-chairmen of the Congressional panel established pursuant to Public Law 99–190 or by the Governor of California on May 7, 1986. The major components of those proposals shall be examined in the final environmental impact statement for the program. Consideration or acceptance of any such recommendation shall not require the preparation of a revised or supplemental draft environmental impact statement.

(b) The Secretary shall submit a copy of the draft proposed final leasing program for off-shore California to the cochairmen of the negotiating group referred to in subsection (a) who shall have a period of 30 days in which to review such program and provide their comments and the comments of the negotiating group on it to the Secretary prior to its submission to the President and the Congress. When submitting the proposed final leasing program to the President and the Congress in accordance with section 18(d) of the Outer Continental Shelf Lands Act (43 U.S.C. 1344(d)), such submission shall indicate in detail why any specific portion of the proposals referred to in subsection (a) of this section was not accepted.

(c) Prior to approval of the Final Program, referenced in subsection (a), the Secretary may conduct prelease activities for proposed California OCS Lease Sales 95, 91, and 119 and may make changes in those sales on the basis of comments submitted by the Congressional negotiating group or others, except that the Secretary may not issue a: (1) call for information and nominations for Sale 95 prior to March 1, 1987, and no draft environmental impact statement shall be published for Sale 91 sooner than 90 days after the Secretary's submission of the draft of the proposed Final Five Year Program to the members of the Congressional panel, and (2) final notice of lease sale for Lease Sale 91 prior to January 1, 1989.

(d) The members of Congress designated under Sec. 111 of Public Law 99–190 (99 Stat. 1243) are hereby authorized to continue as the Congressional negotiating group and to negotiate with the Department of the Interior, to provide the Secretary of the Interior with the appropriate range of advice, including proposals, and to review and comment on proposals by the Department of the Interior with respect to future oil and gas leasing and protection of lands on the California Outer Continental Shelf.

Pub.L. No. 99–591, § 111, 100 Stat. 3341, 261–62 (1986) (pamphlet pagination).

**28.** In December 1985, Congress designated the two U.S. Senators from California, seven members of California's delegation to the House of Representatives, and the Chairmen and ranking minority members of several pertinent committees and subcommittees of Congress as a special negotiating team to negotiate with the Secretary to resolve the ongoing conflict over California OCS leasing. *See* Continuing Appropriations Act, Fiscal Year 1986, Pub.L. No. 99–190, § 111, 99 Stat. 1185, 1243–44 (1985). This process resulted in the promulgation of two specific proposals, one by Congressman Panetta (D.–Cal.) and the other from Congressman Regula (R.–Ohio).

**29.** Petitioners allege, first, that the Secretary provided an insufficient explanation for rejecting proposals to defer or delete certain environmentally sensitive tracts from leasing consideration or to create development-free buffer zones around these tracts. Second, they challenge the Secretary's response to proposals suggesting that all OCS leases contain stipulations concerning air quality, oil spill response capacity, and other environmental safeguards. Finally, petitioners assert that the Secretary was not suffi-

the following reasons, we hold that petitioners' claim under section 111 is not susceptible of judicial review.

\* \* \* \* \* \*

The section 111 claim is unique in this litigation. In contrast to petitioners' other challenges, the section 111 contention does not fall within the ambit of either OCSLA or NEPA. Unlike those two statutes, section 111 contains no express statement of purposes or goals. Unlike those statutes, section 111 contains no set of factors for the Secretary to consider when responding to proposals or for a court to consider when reviewing the Secretary's response. Unlike these statutes, section 111 contains no provision for judicial review.

Section 111 is, in essence, a reporting provision. It embodies a direction from Congress that the Secretary respond to congressionally-designated OCS proposals and submit these responses to Congress itself. Congressional reporting requirements are, of course, legion in federal law.[30] What is remarkable in light of these ubiquitous requirements is that petitioners have failed to provide a single pertinent authority that suggests, much less holds, that these commonplace requirements are judicially reviewable.[31] We are thus being invited to sail into uncharted waters and hold, at least potentially, that the veritable cornucopia of federal reporting requirements, involving basic interrelationships between the Article I and Article II branches, are appropriate grist for the judicial mill.

Petitioners seek to skirt the novel questions that their challenge poses by claiming that section 111 is essentially a supplement to OCSLA. As they see it, section 111 was designed to "mesh" with OCSLA by holding the Secretary's feet to the fire with respect to proposals generated pursuant to the section 18 process. Petitioners maintain that the Secretary's responses under section 111 should be reviewable to the same extent, and in the same manner, as his decisions under OCSLA.

■ We disagree. If Congress had wanted to link section 111 to the OCSLA process, it could readily have amended OCSLA to achieve that linkage. But amendatory language is conspicuously absent from section 111. It should go without saying that the National Legislature well knows how to amend a statute when it so desires. Indeed, Congress' frequently-evidenced ability in this respect is indicated by numerous other sections within the four corners of Public Law 99–591 itself. *See, e.g.,* Pub.L. No. 99–591, §§ 116, 122, 123, 100 Stat. 3341, 266–67 (1986) (pamphlet pagination) (amending sections of the National Parks and Recreation Act, the Indian Long–Term Leasing Act, and the Surface Mining Control and Reclamation Act, re-

---

ciently comprehensive in his response to a proposal that California OCS leasing be phased over time.

**30.** A cursory examination of the U.S. Code reveals over 150 of such requirements, ranging from a directive that the Secretary of each military department provide "specific information" to Congress every six months concerning contracts for research and development, *see* 10 U.S.C. § 2357 (1982), to a requirement that the Great Lakes Commodities Marketing Board submit a "detailed statement" of its findings to Congress with regard to the economic revitalization of that region, *see* 33 U.S.C. § 2309(b)(7) (Supp. IV 1986). Needless to say, a reporting-to-Congress obligation is entirely different than a congressionally imposed requirement that an Executive Branch department or agency gather information and make that information, upon compilation, publicly available.

**31.** In their brief, petitioners cite *Covelo Indian Community v. Watt,* 551 F.Supp. 366 (D.D.C.

1982), *aff'd,* No. 82–2377 (D.C.Cir., Dec. 21, 1982), *vacated as moot,* No. 82–2377 (D.C.Cir., Feb. 1, 1983), as authority for the proposition that the Secretary's responses to Congress are judicially reviewable. *See* Reply Brief for Petitioners at 39. However, it is elementary that a vacated district court decision is not binding precedent and should not be cited as such. *See United States v. Munsingwear,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). Furthermore, although petitioners cited *Covelo* under the signal of *"see, e.g.,"* they were unable to provide any other authorities to support their position, either in their papers or at oral argument. Moreover, our own research has revealed no case in which a court has dealt with the issue. *Cf. 13th Regional Corp. v. United States Dep't of Interior,* 654 F.2d 758, 762 n. 6 (D.C.Cir.1980) (noting the issue of standing under a congressional reporting requirement, but expressing no opinion on the merits).

spectively). But Congress' employment of amendatory language stops, as it were, at the doorstep of section 111. This omission is of pivotal interpretive significance; for regardless of any functional "enmeshment" of the two statutes, it is well settled that amendments by implication (like repeals by implication) are disfavored. *See United States v. Welden,* 377 U.S. 95, 103 n. 12, 84 S.Ct. 1082, 1088 n. 12, 12 L.Ed.2d 152 (1963); 1A N. Singer, *Sutherland Statutory Construction* § 21.13 (4th ed. 1985) (citing cases). This is a basic premise of our representative democracy; legislatures, not courts, amend and repeal statutes.

Petitioners therefore must seek refuge in the general presumption of reviewability of agency action. *See United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 675, 98 L.Ed.2d 830 (1988); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967). We think the presumption is inapplicable here. First, and most importantly, the nature of the "agency action" at issue is quite distinct from the prototypical exercise of agency power. In the run-of-the-mill case, the agency whose action is challenged has exercised authority delegated (at least arguably) to it by Congress. The agency in such circumstances is exercising legislative functions (via formal or informal rulemaking) or adjudicatory functions that have been specifically ordained by Congress. As a basic element of

our system of checks and balances, Congress has seen fit to provide broadly for judicial review of those actions, affecting as they do the lives and liberties of the American people. This is fully in keeping with fundamental notions in our policy that the exercise of governmental power, as a general matter, should not go unchecked.[32]

Executive responses to congressional reporting requirements of the kind presented here represent, we believe, an entirely different sort of agency action. Under the reporting requirement before us, the designated Executive Branch officer is simply reporting back to the source of its delegated power in accordance with the Article I branch's instructions. Lacking a provision for judicial review, the measure before us embodies a requirement that by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements.[33] Here, the contention is not that the Secretary failed entirely to report back to Congress (and the Governor), but that the Secretarial response lacked the requisite "detail." This had the unfortunate effect, we are told, of hampering on-going negotiations between Congress and the Executive. But this seems to us a judgment peculiarly for Congress to make in carrying on its own functions in our constitutional system, not for non-congressional parties to carry on as an ersatz proxy for Congress itself. If the

**32.** There are, of course, several exceptions to the general presumption of reviewability. First, under § 701(a)(1) of the APA, the presumption does not apply where "statutes preclude review." 5 U.S.C. § 701(a)(1) (1982). The Supreme Court has construed this exception to apply "only upon a showing of clear and convincing evidence of legislative intent." Lindahl v. Office of Personnel Management, 470 U.S. 768, 778 (1984). Second, under § 701(a)(2) of the APA, the presumption does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1982). The Supreme Court has interpreted this exception narrowly, describing it as applicable only in those rare situations where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Finally, a third exception, relating to agency inaction, has emerged from § 701(a)(2).

Thus, in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), an agency's refusal to take enforcement action was declared presumptively unreviewable. *Id.* at 831, 105 S.Ct. at 1656. In sum, the Court has explained that "the presumption favoring judicial review is not to be applied in the 'strict evidentiary sense,' but may be overcome whenever the congressional intent to preclude review is fairly discernible in the statutory scheme." *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 675, 98 L.Ed.2d 830 (1988) (quoting *Block v. Community Nutrition Inst.,* 467 U.S. 340, 351, 104 S.Ct. 2450, 2456–57, 81 L.Ed.2d 270 (1984)).

**33.** We obviously decide only the issue before us; we have no occasion to pass on the broad, theoretical question whether an interbranch reporting requirement can ever be reviewable in the absence of an express provision for judicial review.

Secretary's response has indeed been deemed inadequate (in the statutory sense of "insufficiently detailed") by its recipient, then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action. It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives. In short, in the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships.

This brings us to the second, and closely related, reservation about embracing the customary presumption of reviewability in this unusual setting. Under the specific circumstances of this reporting provision, we despair at formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response to the strictures of section 111. Whether a report to Congress is sufficiently "detailed" within the meaning of section 111 is an inquiry which strikes us as inherently elusive, especially in light of the statute's apparent purpose to inform and further the ongoing interbranch negotiation process.[34] This is all the more true in this situation where numerous negotiating sessions between the Secretary and the congressional negotiating team undoubtedly shaped the contours and content of an appropriate Secretarial response.[35] What may seem in the abstract to be reasonable factors to employ under the "in detail" standard of section 111 may be inappropriate in the extreme in the context of an on-going process of give and take in various negotiating sessions. The potential for incongruity is all the

more acute when we do not have before us, even as *amici,* all the congressional actors in the section 111 process.

In sum, what counsels restraint on our part in this case is the reality of a governmental culture, as it were, based on on-going relationships between the two political branches in our system of separated powers. Generally, congressional reporting requirements are, and heretofore have been, a management tool employed by Congress for its own purposes. We decline to take the remarkable step, rife with the danger of flooding an already over-burdened judicial system with failure-to-report cases, of reviewing petitioners' section 111 claim when Congress has not provided for judicial scrutiny of this aspect of the interbranch relationship. Under these circumstances, the presumption of reviewability of agency action is woefully inapposite.

## VI. CONCLUSION

For the reasons stated in section III.C. of this opinion, we conclude that the Secretary's consideration in the FEIS of the cumulative impacts of the five-year program on migratory species does not satisfy the requirements of NEPA. We therefore remand that matter for further consideration by the Secretary. In all other respects, we deny the petitions for review.

STARR, Circuit Judge, dissenting in part:

I write separately to address briefly a solitary point of divergence with my colleagues on the issue of the Secretary's compliance with NEPA's strictures. In light of the governing standard of review, as aptly elucidated in the court's opinion at pages 294–295, 297, it appears to me that the Secretary's analysis of the cumula-

---

**34.** *See* H.R.Rep. No. 714, 99th Cong., 2d Sess. 41–42 (1986) (discussing purpose of Pub.L. No. 99–591, § 111); S.Rep. No. 210, 99th Cong., 1st Sess. 22 (1985) (same for Pub.L. No. 99–190, § 111). It is for this reason, in addition to Congress' failure explicitly to amend OCSLA, that we refuse to follow petitioners' suggestion of adopting the section 18 standards as our guide for judicial review. Those standards were designed to ensure that the Secretary remained faithful to the particular substantive goals of

OCSLA; they were not designed for service in a context, such as section 111, where the Secretary's apparent mandate is to work toward political consensus.

**35.** We are told that in 1986 Department of Interior officials met 16 times with the special negotiating panel established by Congress. *See* Brief for Respondent at 54.

tive effects of the OCS program on migratory mammals passes muster. It does so, I hasten to add, without flying colors. There is little doubt that the Secretary's discussion of these matters is vulnerable to the criticisms laid at his feet by the court.

Nevertheless, I am persuaded that other parts of the record combine to carry the day for the Secretary on the record as a whole. For example, in discussing the cumulative impacts on marine mammals in the Washington/Oregon planning area, the Secretary stated:

Assuming these projects are permitted, MMS's seabed mining will contribute to underwater noise and disturbance offshore of many marine mammal habitats and migration routes.... Marine mammals which migrate through this Planning Area will be subjected to other impacts outside of the area. Cumulative impacts to these migrating species will probably intensify due to other oil and gas activities within their range to the north and south, including the OCS activities off California and Alaska. Noise levels are expected to increase throughout much of the range of these species.

FEIS IV.B.7.–25. Similar cumulative analysis was provided in examining impacts on threatened and endangered species in the North Aleutian region:

Development in this planning area could add long term effects, especially to gray whales which migrate through the planning area. Gray whales, because they migrate through OCS Planning Areas from California to Alaska are the species most likely to be affected. The nearshore area appears to be one of the first significant spring feeding areas and displacement from these areas by oil and gas activities could result in long term changes of migration routes and timing of the migration.

FEIS IV.B.15.–15–16. A final example comes from the Secretary's discussion of cumulative impacts on threatened and endangered species in the Gulf of Alaska region:

The offshore movement of the gray whale migration has not conclusively

been linked to an increase in OCS activities of [sic] California.... This indicates that although minor localized course alterations or avoidance reactions have occurred, major long-term effects on migration routes or population levels are not anticipated for the OCS sound sources tested.... Impacts on gray whales throughout their migration route (California to the Beaufort Sea) are expected to be moderate.

FEIS IV.B.11.–21; *see also* FEIS IV.B.7.–32–33 (discussing cumulative impacts on threatened and endangered species in Washington/Oregon region); FEIS IV.B. 10.–43 (discussing cumulative impacts on threatened and endangered species in Southern California region). This evidence persuades me that the Secretary's analysis of cumulative impacts, while not as comprehensive as a reviewing court might reasonably want it to be, is sufficiently informed and well-considered to meet the rather generous standard of review.

I am unable, however, to reach the same conclusion with respect to the Secretary's discussion of migratory salmon. Like my colleagues, I am unable to discover any meaningful analysis of impacts on this species, *see* FEIS IV.B.11.–9; IV.B.12.–5, 6; IV.B.14.–7, and therefore join the court in concluding that this issue should be remanded for further review.